IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

BETH HUNTER and MONIQUE
PRATTO n/k/a MONIQUE BRUCE,

      **Plaintiffs,**

v.                                                **CIV. No. 98-0077 JP/JHG**

PLB ENTERPRISES, INC., QUALITY
DINING, INC., BRUEGGER'S FRESH
BAGEL BAKERY, and PATRICK
BEATTY.

      **Defendants.**

## MEMORANDUM OPINION AND ORDER

      On June 15, 2000, Defendants Quality Dining, Inc. and Bruegger's Fresh Bagel Bakery (collectively "Bruegger's") filed a motion for summary judgment (Doc. No. 60).  After a careful review of the briefs and the relevant law, I have determined that Bruegger's motion should be granted as to Plaintiffs' claims brought under Title VII and the Equal Pay Act.  However, the briefing of the motion as it relates to state law claims against Bruegger's is insufficient to permit a definitive ruling at this time.

**I.     LEGAL STANDARD**

      A court should grant summary judgment only if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The Supreme Court has observed that a genuine issue of material fact exists where "the evidence is

such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Initially, the moving party carries the burden of establishing that "there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The burden then shifts to the party opposing the motion, who must come forward with evidence, beyond mere allegations or denials of the pleadings, which shows that a genuine issue of material fact exists.  *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991).  In deciding a motion for summary judgment, courts should "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment."  *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc*, 912 F.2d 1238, 1241 (10th Cir. 1990).

In this case, Plaintiffs have suggested that granting a motion for summary judgment at this stage of the litigation would be premature.  Plaintiffs argue that "[w]ith further discovery from Bruegger's corporate and Quality Dining, Plaintiffs will have more evidence to present to the trier of fact in this case to convince the trier even further**"** that they have stated *prima facie* causes of action against Defendants.  Plaintiffs' Memorandum in Opposition to Motion for Summary Judgment of Defendants Bruegger's and Quality Dining, at 17 (Doc. No. 62), filed July, 3, 2000.

A court may refuse to grant a motion for summary judgment, or may allow a continuance for further discovery, "[s]hould it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition."  Fed. R. Civ. P. 56(f).  In order to obtain such a continuance, the nonmoving party must follow the appropriate procedural requirements– filing a motion under Rule 56(f) and including an affidavit which states "with specificity why extra time is needed and how the

2

additional time and material will rebut the summary judgment motion." *Int'l Surplus Lines Ins. Co. v. Wyoming Coal Refining Sys., Inc.*, 52 F.3d 901, 905 (10th Cir. 1995). *See also Dreiling v. Peugeot Motors of America, Inc.*, 850 F.2d 1373, 1376-77 (10th Cir. 1988). The Tenth Circuit has observed that "[w]here a party opposing summary judgment and seeking a continuance pending completion of discovery fails to take advantage of the shelter provided by Rule 56(f) by filing an affidavit, there is no abuse of discretion in granting summary judgment if it is otherwise appropriate." *Pasternak v. Lear Petroleum Exploration, Inc.* 790 F.2d 828, 832-33 (10th Cir. 1986).

As Bruegger's points out, Plaintiffs have filed no formal motion or affidavit under Rule 56(f). Moreover, Plaintiffs do not refer to Rule 56(f) when they argue that summary judgment would be premature without a greater opportunity for discovery. Plaintiffs' discussion of their need for additional discovery does not identify with particularity the types of information they need time to uncover, or how that information will assist in their opposition to the motion for summary judgment. Plaintiffs have not complied with the procedural requirements for receiving a continuance under Rule 56(f). Hence, this Court finds that it is proper to proceed with the consideration of Bruegger's motion for summary judgment.

## II.    BACKGROUND

In June 1995, Michael Beatty, defendant Patrick Beatty's father, entered into franchise and development agreements with Defendant Bruegger's Fresh Bagel Bakery. These agreements granted Michael Beatty the exclusive right to establish and operate Bruegger's restaurants in New Mexico and obliged him to open five restaurant locations in the state over a five year period. In July 1995, Michael and Patrick Beatty formed PLB Enterprises, Inc. ("PLB"), of which Patrick

3

Beatty was an officer, a director, and the sole shareholder.  In October, 1995, Michael Beatty assigned PLB his interest in the Bruegger's franchise agreement.  In June, 1996, Bruegger's sold its concept and franchise contracts to Defendant Quality Dining, Inc.

As he prepared to open his first Bruegger's restaurant in Albuquerque, Patrick Beatty engaged the services of Dick Wray & Associates, an employment recruiting company, to locate candidates for managerial positions.  In April, 1996, a Dick Wray & Associates recruiter contacted Plaintiff Elizabeth Hunter.  Ms. Hunter was then working as a training manager at a Wendy's restaurant franchise in Albuquerque, and she also had employment experience with other fast food chains. Over several conversations with Ms. Hunter, the recruiter explained that Bruegger's stores would soon be opening in Albuquerque.  When Ms. Hunter expressed interest in working for Bruegger's, the recruiter arranged an appointment for her with Patrick Beatty and Michael Beatty.  Ms. Hunter had two interviews with Patrick Beatty, during which Mr. Beatty provided some background information about the Bruegger's chain and outlined his plans for the establishment of Bruegger's locations in New Mexico.  Several weeks later, on May 12, 1996, Patrick Beatty hired Ms. Hunter to open and manage the first two Bruegger's locations.

In April 1996, another Dick Wray recruiter separately contacted Plaintiff Monique Pratto, who was also a manager at a Wendy's restaurant in Albuquerque.  Ms. Pratto discussed the call with Ms. Hunter and other Wendy's managers, who informed her that they had been contacted as well.  The Dick Wray recruiter set up an interview between Ms. Pratto and Patrick and Michael Beatty.  At the interview, Ms. Pratto exhibited some concern about the financial stability and prospects of Patrick Beatty and the Bruegger's corporation.  Patrick Beatty reassured Ms. Pratto when he showed her literature about the national franchise and informed her he would be

4

operating the Albuquerque stores in conformity with Bruegger's corporate standards.  On May 20, 1996, Patrick Beatty hired Ms. Pratto as assistant manager at the first Bruegger's location in Albuquerque.

Upon beginning their jobs, Ms. Hunter and Mr. Pratto received an Employee Orientation Handbook from Patrick Beatty.  The first page of this handbook included the notation, "Owned and Operated by PLB Enterprises, Inc."  The orientation materials contained a variety of employment forms, which new employees were required to read and sign.  Some of these forms, including the Hazardous Substances Employee Orientation Checklist and the Employee Safety Checklist, referred to signatories as "employees of Bruegger's Bagel Bakery."  The caption on the form listing all of the required paperwork read "Bruegger's Orientation Checklist" and directed that new employees' W-4 and I-9 forms "must be filled out and sent to the Corporate Office IMMEDIATELY!"

Patrick Beatty sent both Ms. Hunter and Ms. Pratto to a three-week training program at a Bruegger's corporate facility in Burlington, Vermont.  During this course, Plaintiffs learned how to operate Bruegger's restaurants.  The individuals conducting the training course were Bruegger's corporate employees.  The training supervisors evaluated Plaintiffs on their performance in the course. Bruegger's personnel provided Ms. Hunter with manuals containing standard operation guidelines, which she was instructed to follow in running the Bruegger's locations in New Mexico.  Based on their conversations with Bruegger's corporate employees in Vermont, both Plaintiffs formed the belief that they had been targeted for employment because the Bruegger's corporation recommended that franchises hire Wendy's managers.

When the first Albuquerque store opened in August, 1996, several employees from the

Bruegger's corporation came to Albuquerque to train employees and otherwise assist in the store's opening. These employees stayed in Albuquerque for approximately one week. After this period, no one from Bruegger's corporation returned to the Albuquerque locations to conduct additional training.

The Bruegger's corporation employed a Western Region area manager, Fred Hedin, whose territory included New Mexico. Mr. Hedin was responsible for inspecting the Bruegger's locations in Albuquerque and ensuring that the quality of the products sold at the restaurants met the Bruegger's corporation's specifications. However, during the period when the Albuquerque locations were open and operating, Mr. Hedin never inspected the stores. The Bruegger's corporation hired a company called Audits International to inspect sanitation procedures at the Albuquerque restaurant locations. Audits International inspected the Albuquerque stores three to four times during 1996 and 1997. The Bruegger's corporation hired a different company to conduct a sanitation inspection of the Albuquerque commissary. The Bruegger's corporation never conducted a financial audit of the Albuquerque locations' books.

While Ms. Hunter served as general manager of the first Albuquerque Bruegger's location, from August to December of 1996, she was in occasional contact with representatives from Bruegger's corporate headquarters. Bruegger's corporate employees would call from time to time to inquire about the store. In December, 1996, Ms. Hunter transferred to the position of "out of store manager," which involved preparing for the opening of the second Albuquerque location. During December of 1996, Ms. Hunter was in frequent contact with Bruegger's corporate personnel about improving operations at the Albuquerque commissary.

In December, 1996, Ms. Hunter and Ms. Pratto each filed a Charge of Discrimination with

6

the Equal Employment Opportunity Commission (EEOC).  These charges asserted that Patrick

Beatty had created a work environment hostile to Plaintiffs by calling them names behind their

backs, and by condoning other employees' use of derogatory words in reference to Plaintiffs.

Both Plaintiffs also charged that Patrick Beatty had denied them benefits extended to male

employees, such as reimbursement for gasoline expenses.  In addition, Ms. Pratto charged that

Patrick Beatty had denied her a promotion in favor of a less-qualified male.  In these charges,

each Plaintiff named "PLB Enterprises" as her employer.

     In January, 1997, Ms. Hunter told Ann Van Donsel, at Bruegger's corporate

headquarters, that she and Ms. Pratto had been encountering problems with Patrick Beatty and

had filed charges with the EEOC.  Ms. Hunter never spoke again about the matter with Ms. Van

Donsel or anyone else at Bruegger's corporate headquarters.

     On February 18, 1997, Patrick Beatty called Ms. Hunter into his office at the Commissary

Building and informed her that she was being "laid off" for "corporate financial reasons."  Ross

Perkal, Patrick Beatty's attorney, was present during this meeting but did not participate in the

conversation between Mr. Beatty and Ms. Hunter.  No representatives of the Bruegger's

corporation or Quality Dining attended this meeting.  Also on February 18, 1997, Patrick Beatty

and Mr. Perkal went to the Bruegger's location where Ms. Pratto was working.  Patrick Beatty

told Ms. Pratto that she was being let go for financial reasons.  No representatives of the

Bruegger's Corporation or Quality Dining were present during this meeting.

     On February 20, 1997, Ms. Hunter and Ms. Pratto each filed a second Charge of

Discrimination with the EEOC.  In these charges, Plaintiffs asserted that Patrick Beatty had

terminated their employment in retaliation for their initial filing of EEOC charges in December,

1996.  On April 1, 1997, Plaintiffs amended their charges with the EEOC by naming the

Bruegger's corporation and Quality Dining as employers.

On January 29, 1998, Plaintiffs filed this suit against PLB Enterprises, Quality Dining,

Bruegger's, and Patrick Beatty.  Plaintiffs brought claims under Title VII, the Equal Pay Act, and

a number of state law grounds.  Bruegger's moves for summary judgment on all of the claims on

the basis that it was never in an employment relationship with Plaintiffs.

### III.   DISCUSSION

#### A.     Title VII

Title VII of the Civil Rights Act of 1964 prohibits "an employer" from discriminating on

the basis of sex and other factors.  42 U.S.C. 2000e-2(a).  Plaintiffs raising Title VII

discrimination claims thus must establish that defendants were their employers.  See *Lockard v.

Pizza Hut, Inc.*, 162 F.3d 1062, 1069 (10th Cir. 1998); *Frank v. U.S. West, Inc.* 3 F.3d 1357,

1361 (10th Cir. 1993).  While many Title VII cases involve parties that are clearly in the type of

employment relationship contemplated by the statute, other cases present a closer question.  The

Tenth Circuit has recognized that the issue of "[w]hether an entity is an employer under Title VII"

emerges "where a plaintiff who is directly employed by a franchisee or subsidiary wishes to hold

the franchisor or parent company liable for the discriminatory conduct of its franchisee's or

subsidiary's employees."  *Lockard*, 162 F.3d at 1069.

Courts have turned to several different tests to evaluate whether plaintiffs have shown the

employment relationship required by Title VII.  These tests range from the more strict common

law agency inquiry to the relatively lenient "single employer" or "economic realities" approach.

*Lockard*, 162 F.2d at 1069; *Lambertsen v. Utah Dep't of Corrections*, 79 F.3d 1024, 1029 (10th

Cir. 1996).  Although the Tenth Circuit has found it unnecessary to explicitly adopt the

"economic realities" standard, it has employed this test in several recent cases and has observed a

trend toward the adoption of this test among other circuits.  *Lockard*, 162 F.2d at 1070;

*Lambertsen*, 70 F.3d at 1029; *Frank*, 3 F.3d at 1362; *Evans v. McDonald's Corp.*, 936 F.2d

1087, 1090.

It seems appropriate to begin with the most plaintiff-friendly standard in considering the

defendants' motion for summary judgment, because if the plaintiffs cannot satisfy the "economic

realities" tests, they will not be able to satisfy the stricter tests.  Under the "economic realities"

test, courts examine four factors to determine if there is an employment relationship: interrelation

of operations, centralized control of labor relations, common management, and common

ownership or financial control.  *Lockard*, 162 F.3d at 1069.

### 1.   *Interrelation of Operations*

In the context of franchise restaurant arrangements, the Tenth Circuit has suggested that

an interrelation of operations, by itself, will not distinguish a franchisor and franchisee as

constituting a "single employer."   The Tenth Circuit has observed that many franchisors exhibit

concern over conformity between restaurant locations, and franchisors' involvement in setting

operational standards generally will be insufficient to satisfy the economic realities test.  The

*Evans* court, for example, acknowledged that "McDonald's may have stringently controlled the

manner of its franchisee's operations, conducted frequent inspections, and provided training for

franchise employees."  *Evans*, 936 F.2d at 1090.  However, because the plaintiffs had shown only

"the necessary control over conformity to operational details inherent in many franchise settings,"

and not more extensive control, the *Evans* court held that plaintiffs had not satisfied the economic

realities standard.  *Id*. at 1090.

In this case, the Plaintiffs have identified a number of ways in which the operations of the Bruegger's corporation interrelated with those of the Albuquerque stores owned by PLB Enterprises.  Bruegger's ran a national training facility, at which Plaintiffs attended a training program; Bruegger's employees traveled to New Mexico to assist with the first Albuquerque store's opening; Bruegger's employees offered advice and guidance to Ms. Hunter over the telephone;  Bruegger's distributed manuals detailing operational guidelines; and Bruegger's arranged for sanitation inspections of the stores.  These activities all seem to stem from Bruegger's efforts to maintain operational standards among its franchises.[1]  With evidence of such efforts, Plaintiffs satisfy the first element of the economic realities test.  Under Tenth Circuit case law, though, satisfaction of this element is not especially significant in the overall determination of whether a franchisor and franchisee are a "single employer" under Title VII.

2.   *Centralized Control of Labor Relations*

The Tenth Circuit has stressed  that centralized control of relations is a particularly important element in the four-part "economic realities" test.  See, e.g., *Frank*, 3 F.3d at 1363; *Evans*, 936 F.2d at 1090.  Under this prong of the test, "[t]he critical question is, '[w]hat entity made the final decisions regarding employment matters related to the person claiming

---

[1]      In arguing that they have met the "interrelation of operations" element, Plaintiffs argue that Bruegger's had a great deal of interest in the Albuquerque stores' success because the corporation wished to expand into the Western states and build the company to the extent that it could go public.  This fact, if true, does not seem to represent a unique feature of the business entities in this case.  Franchisors and franchisees often share common goals and depend on the general success of the other.  Bruegger's insistence on conformity in operational standards was presumably an attempt to promote such common goals as product quality and the good reputation of the chain.

discrimination?'" *Frank*, 3 F. 3d at 1363 (quoting *Trevino v. Celanese Corp.*, 701 F.2d 397, 404 (5th Cir.1983). The Tenth Circuit has noted that "[a] parent's broad general policy statements regarding employment matters are not enough to satisfy this prong." Id. Rather, "a parent must control the day-to-day employment decisions of the subsidiary." *Id.*

Plaintiffs have asserted that Bruegger's played a role in employment decisions in at least three ways: through influencing PLB Enterprises' hiring of Plaintiffs, through involvement in daily management, and through corporate requirements reflected in employee orientation materials.

a.    Hiring

The Franchise Agreement between PLB and Bruegger's provided that "Franchisee shall be solely responsible for all employment decisions and functions of the Bakery, including, without limitation, those related to hiring, firing, training, wage and hour requirements, recordkeeping, supervision, and discipline of employees." Shareholder Franchise Agreement, § 7.3.[2] The evidence indicates that Patrick Beatty and Michael Beatty conducted the job interviews with Ms. Hunter and Ms. Pratto, and that Patrick Beatty extended employment offers to the Plaintiffs. Nevertheless, Plaintiffs have argued that the Bruegger's corporation played a role in PLB Enterprises's hiring decisions. First, Ms. Hunter, in an affidavit, stated that Mr. Beatty told her that he was required to seek approval from Bruegger's before offering her the position of general

---

[2]        This provision of the Franchise Agreement does refer to one exception– "Except to the extent provided in Section 5.1 of the Development Agreement." Section 5.1 states that a developer is required to hire a person for the position of  "operator" of all of that developer's bakeries, and that Bruegger's must approve in writing of the developer's choice of operator. Here, the Plaintiffs have offered no argument that either of them held the position of operator. Further, because Section 5.1 provides that Bruegger's may not unreasonably withhold approval of operators, it is doubtful that its approval rights would constitute "control" over franchisees' employment decisions.

manager.  (Plaintiff's Response, Exhibit F, at ¶ 7)  This statement appears to contradict Ms.

Hunter's earlier deposition testimony, in which she stated that Patrick and Michael Beatty did not

indicate that Bruegger's had to authorize her hiring, but that the Beattys may have turned to

Bruegger's as a resource for advice.[3]

Bruegger's contends that this Court should not consider the affidavit statements that are

contrary to the deposition testimony, because Plaintiffs are attempting to create sham questions of

material fact to defeat summary judgment.  (See Reply to Plaintiffs' Memorandum in Opposition

to Motion for Summary Judgment of Defendants Bruegger's and Quality Dining, Inc. at 9, fn. 3,

citing *Rios v. Bigler*, 67 F.3d 1543, 1551 (10th Cir. 1995).  Without going so far as to accuse

Plaintiffs of creating sham issues of fact, this Court finds that it cannot take Ms. Hunter's affidavit

into account as evidence.  In deciding motions for summary judgment, courts may consider only

admissible evidence.  Fed. R. Civ. P. 56(e).  Ms. Hunter has no personal knowledge of the role

that Bruegger's played in her hiring, and under Fed. R. Evid. 602, witnesses may only testify to

matters of which they have personal knowledge.  Ms. Hunter's report of Mr. Beatty's out of

court statement would be inadmissible as substantive evidence that Bruegger insisted on

approving Mr. Beatty's hiring decisions, because it is hearsay.  See Fed. R. Evid. 801, 802.

In their list of controverted material facts, Plaintiffs also refer to Ms. Pratto's deposition

---

[3]       Hunter Deposition, 28: 1-7.
Q:      But let me talk about the hire.  Do you know, did they [Patrick and
        Michael Beatty] ever tell you that your job offer was conditional upon
        them getting authority or an okay–
A:      No.
Q:      – from Bruegger's?
A:      No.  And I think they were talking to Bruegger's probably more as a
        feedback mechanism.

testimony as supporting the proposition that Bruegger's retained the right to approve of Patrick

Beatty's hiring decisions.  During her training in Burlington, Ms. Pratto formed the belief that

Bruegger's must have been involved in her hiring, because personnel at the national training

center were aware that she had previously worked at Wendy's.[4]  Even if her inference were

admissible as evidence of Bruegger's role in the hiring process,  her testimony does not indicate

that Ms. Pratto understood Bruegger's to control hiring decisions.  She seemed to believe that

PLB may have consulted Bruegger's about managerial candidates, not that Bruegger's had any

decision-making power over the matter.

     Plaintiffs contend that Bruegger's also involved itself in the hiring process by influencing

PLB Enterprises's decision to recruit, or enlist an employment agency to recruit, managers at

Wendy's.  Ms. Hunter and Ms. Pratto developed this idea through conversations with Bruegger's

employees at the Burlington training facility.  Assuming that it is true that Bruegger's encouraged

recruitment from Wendy's, Plaintiffs have still not shown how a franchisor's suggestion to a

franchisee about good sources of employees rises to the level of the "final decisions regarding

employment matters" required by *Frank*.

---

[4]     Pratto Deposition, 23: 8-17.
     Q:     Who hired you?
     A:     Patrick and Michael and Bruegger's.  I know they had– I know they knew
        about me.
     Q:     How do you know that?
     A:     Because, when I was in Burlington to train, they brought up my Wendy's
        training numerous times.  So they– In their discussion with me about my
        past restaurant experience, I felt that somebody must have consulted them
        about hiring me, because I'm from Albuquerque.  What do they know
        about me?

13

b.     Daily Management

Both Plaintiffs have conceded  that Patrick Beatty, and not a Bruegger's corporate

employee, acted as their supervisor.  Plaintiffs maintain, though, that Bruegger's played a role in

the decisions affecting day-to-day employment matters, because the corporation set policies

governing issues such as the number of employees to be scheduled for a work shift.  It does

appear that at the national training program in Vermont, Patrick Beatty, Ms. Hunter, and Ms.

Pratto received information about corporate guidelines that reflected these policies.  However, as

the *Lockard* court noted, plaintiffs must show not just that corporate employment policies existed,

but also "what role, if any, [the franchisor] played in implementing or effecting these policies."

162 F.3d at 1071.  In this case, it seems that Patrick Beatty and his delegates, such as Ms. Hunter,

made the daily management decisions affecting employment at the Albuquerque store.  While

Bruegger's policies may have guided these decisions, Plaintiffs have not pointed to ways in which

Bruegger's oversaw the decisions.  Bruegger's training personnel stayed at the store for only one

week, for example, and the regional manager whose territory included New Mexico never visited

the store.

c.     Orientation Materials

In asserting that Bruegger's had centralized control over labor relations, Plaintiffs also

stress the references to Bruegger's in the Orientation Handbook.  Plaintiffs offer no analysis,

though, as to how the corporate label on the orientation materials, or Bruegger's collection of

employment forms, reflected *control* over franchisees' labor relations.[5]  To the extent that such

forms as the "Orientation Checklist" were intended to ensure that all new employees of

Bruegger's franchises followed the same orientation procedures, they would seem to represent

efforts to have uniform operations in Bruegger's stores.  As this Court discussed in section

III(A)(1) *supra*, such efforts are not enough to support a finding that entities constituted a "single

employer."

Overall, Plaintiffs' evidence fails to show that Bruegger's played a significant role in

decisions affecting employees of PLB Enterprises.  Plaintiffs, hence, cannot satisfy the element of

centralized control over labor relations.

*3.*   <u>*Common Management*</u>

In evaluating whether Plaintiffs have satisfied the "common management" prong of the

"economic realities" test, the Tenth Circuit has examined whether the business entities in question

share any officers, directors, and managers.  The cases have held that any overlap in managerial

personnel must be more substantial than one person.  For example, the *Lockard* court, noting that

the same individual served as a vice-president of both the franchisor and franchisee corporations,

stated that "[a]lthough the record establishes some common management between the two

entities, it is not sufficient to satisfy the common management requirement of the single employer

test."   162 F.3d at 1071.  Similarly, the *Frank* court observed that "[o]ne common manager is

---

[5]       This Court is somewhat reluctant to consider these orientation forms, as neither
Plaintiffs nor Bruegger's make clear who prepared the forms, and in what context.  At least one
of the forms ("The Employee Safety Checklist" ) refers to Washington State Safety and Health
Codes, which suggests that they were not originally made for the Albuquerque location or for the
general use of Bruegger's locations nationwide.  These questions may cast into doubt the
significance of these forms in examining the relationship between Bruegger's and PLB.

15

insufficient to establish a disputed material fact under this prong of the integrated enterprise test."
3 F.3d at 1364.

In contrast to *Lockard* and *Frank*, in which the business entities shared at least one officer
or manager, Plaintiffs in the present case have shown no common managers between PLB
Enterprises and the Bruegger's corporation.  Plaintiffs assert that Bruegger's exercised common
management over franchises through its national training program, its reliance on regional
managers, and through communication between corporate personnel and franchisee  managers
regarding restaurant operations.  However, these practices seem to fall into the category of
attention to operational standards.  As this Court explained in section III(A)(1) *supra*, finding that
a franchisor is concerned with conformity in operations is not sufficient to conclude that
franchisor and franchisee constituted a "single employer."  In addition, Bruegger's evidence raises
doubt as to the practical effect of some of Bruegger's mechanisms for ensuring operational
conformity.  For example, Fred Hedin, the Bruegger's regional manager assigned to New Mexico,
never inspected the Albuquerque stores.

### 4.   *Common Ownership or Financial Control*

The Tenth Circuit tends to accord less weight to the element of common ownership or
financial control than to other elements of the "economic realities" standard, as the *Frank* case
reflects.  *Frank* involved a parent company which was the sole shareholder in its subsidiary.  The
*Frank* court stated that even whole ownership, "standing alone, can never be sufficient to
establish parent liability."  3 F.3d 1364.  The *Lockard* court reiterated this statement when it
declined to find that a parent company and its wholly-owned subsidiary were sufficiently related
to satisfy the "economic realities" test.

16

Plaintiffs argue that the franchise and development agreements entered by PLB Enterprises and Bruegger's created a relationship of common ownership between the companies. Under these agreements, Plaintiffs note, Bruegger's reserved the right to collect a percentage of the Albuquerque stores' receipts. Patrick Beatty, in turn, received stock options through which he acquired shares of the Bruegger's corporation. Granted, these facts may indicate that Bruegger's and PLB each had a financial stake in the performance of the other. However, Plaintiffs' assertion that the companies' arrangement approached common ownership overstates the entities' business relationship.

Nor does it appear that Bruegger's otherwise exercised financial control over PLB. In fact, Bruegger's evidence suggests that the Bruegger's corporation's actual financial oversight with regard to PLB was slight. Patrick Beatty stated in his deposition that Bruegger's never conducted a financial audit of the Albuquerque stores, and Plaintiffs have not disputed this fact. Given that the Tenth Circuit has declined to place much weight even on whole ownership, the facts that Plaintiffs point to under this element fall far short of making up for the deficiencies in the other prongs of the integrated enterprise test.

Based on this examination of the four factors of the "economic realities" test, and construing the facts in the light most favorable to Plaintiffs, this Court finds that Plaintiffs have failed to show that they were in an employment relationship with Bruegger's. Plaintiffs have thus not established a *prima facie* case against Bruegger's under Title VII, and summary judgment on that claim is proper.

**B.     Equal Pay Act**

Plaintiffs' Complaint raises federal claims against Bruegger's not just under Title VII, but

under the Equal Pay Act as well.  The Equal Pay Act is part of the Fair Labor Standards Act

(FLSA).  29 U.S.C. § 206(d).   In its motion for summary judgment, Bruegger's offers no analysis

and cites no cases that are particular to the Equal Pay Act claim. Nor does Breugger's discuss the

connection between the definition of "employer" under Title VII and the definition under the

Equal Pay Act.  On the other hand, Plaintiffs provide no argument that the standard for

determining whether a plaintiff and defendant were in an employment relationship should differ

from the standard employed in Title VII cases.  In fact, while the definitions of "employer" under

Title VII and FLSA are not identical, they are similar.  Discussing Title VII, the Age

Discrimination in Employment Act, and FLSA, the *Wheeler* court noted that "[i]n general, cases

construing definitions of one of the Acts are to be viewed as persuasive authority when

interpreting the others."  *Wheeler v. Hurdman*, 825 F.2d 257, 263 (10th Cir. 1987).

    The Supreme Court has held that "[t]he test of employment under [FLSA] is one of

'economic reality.'"  See, e.g., *Tony and Susan Alamo Foundation v. Secretary of Labor*, 471

U.S. 290, 301 (1985).  The Tenth Circuit has used an economic realities test in determining

whether a general partner in an accounting firm was an employee under the Equal Pay Act.

*Wheeler*, 825 F.2d at 271.  Because this Court applied an "economic realities" standard in

determining whether the Plaintiffs had established a *prima facie* case under Title VII, the Title VII

analysis can be extended to the Equal Pay Act claim.

    Extending the "employer" finding under the Title VII analysis to the Equal Pay Act claim,

this Court holds that Plaintiffs have not shown that Bruegger's was their employer, as required

under the Equal Pay Act.  Thus Bruegger's motion for summary judgment on this claim should be

granted.

C.      **State Law Claims**

In addition to their federal discrimination claims, Plaintiffs raise several state law claims: intentional infliction of emotional distress, breach of contract, wrongful termination, and breach of implied covenant of good faith.  In its motion for summary judgment, Bruegger's fails to address specifically any of these state law claims, implying instead that its treatment of the federal issues applies to the state claims as well.[6]   Bruegger's does not advance any arguments or cite any case law in support of its implication that the standard for determining whether a defendant is an employer under Title VII is the same as the standard for determining vicarious tort and contract liability under New Mexico law.  Plaintiffs' Response, in turn, focuses only on the Title VII standard and suggests no alternative tests for the New Mexico state tort and contract claims.

Under these circumstances, the court at this time will deny Bruegger's motion as to Plaintiffs' state law claims, but will permit Bruegger's to file and serve another motion for summary judgment directed against Plaintiffs' state law claims, properly and fully briefed, by not later than October 25, 2000, to which Plaintiffs must respond by November 10, 2000.  The motion package filing rule, D.N.M. LR-Civ. 7.3(a)(1) through (5), will be waived as to this motion for summary judgment.

---

[6]     See Memorandum in Support of Motion for Summary Judgment at 6 ("In order to state a claim under Title VII, Plaintiffs must establish an employment relationship.  Similarly, by its terms, the Equal Pay Act requires an employment relationship, as do all of Plaintiffs' other claims.") and at 9 ("Plaintiffs' Title VII, Equal Pay Act and state law claims are premised on an employment relationship with Quality Dining and Bruegger's.  Plaintiffs' claims against these Defendants must fail because Plaintiffs cannot establish the elements of the "integrated enterprise" test, the most liberal test applied by the Tenth Circuit.")

IT IS THEREFORE ORDERED that:

(1)    Bruegger's Motion for Summary Judgment (Doc. No. 61) is GRANTED, as to the Plaintiffs' claims arising under Title VII and the Equal Pay Act, which will be dismissed with prejudice as to Bruegger's;

(2)    Bruegger's motion for summary judgment is denied at this time as to Plaintiffs' state law claims, but Bruegger's may file and serve by no later than October 25, 2000 a new motion for summary judgment directed against Plaintiffs' state law claims, to which Plaintiffs' may respond by no later than November 10, 2000.


_____

CHIEF UNITED STATES DISTRICT JUDGE